Good morning, Your Honors. It's Bob Behrens for the appellants, and with me is Adam Milton. There were two pages I gave you that was Exhibit 437 from the trial court. There were three pages given mistakenly. It's just the first two pages. Okay. Those pages show how there were 80 invoices that were submitted by February 14th, and only two of those 80 were paid. There was clear testimony in the trial that Ramona believed that there was a default. Ramona then had meetings and constant discussions with Otay Group, and there was even a demand that $200,000 be paid by the end of March 2001. The payment wasn't made. There was clear testimony, and I'm going to read it, and I rarely do during these arguments, but that they knew there was a bond. They knew there was a payment bond, and that's why they let these invoices continue to approve and not be paid. You know, I'm pretty familiar with everything you just said about the record and all these invoices that have not been paid and the few that had been paid. And really, I guess what interests me is, you know, why isn't it okay under the Miller Act to submit, you know, to claim the last, the total amount that's due in owing? And you're going to the 90-day notice issue? Yes. Why isn't that consistent with the overall purpose of the Miller Act? Because here you have two different statutes. There's the statute of limitation, which is in B-4, and you have the 90-day notice for a second-year claimant. And that 90-day notice ends with for which such claim was made. The statute of limitation relates to the person. So it's the person making the claim. Right. So it says may bring, if you go to the statute, B-2, it's B-2, is that right? Yes. Right? It says a person having a direct contractual relationship with a subcontractor but no contractual relationship expressed or implied with the contractor furnished in the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made. Right. And it's those last words, which such claim was made. And this is a matter of pure statutory interpretation, is it not? Yes. The courts are split on it, aren't they? The courts are split, and the cases that have looked at repeated contracts and whether there is a claim based on the underlying contract, that there's the Country Boys, there's the DeFilippis case, that both say the claim that was made is the underlying contract. So here there is a claim. Well, the underlying contract here was the real underlying contract here was an open book account. No. The open book account, if there was a true open book and they were billing like that, they would have billed for both jobs. They had jobs in California and New Mexico and never once. Why would they have to do that? I don't understand. Because the open book account. You know, for purposes of their just own accounting and billing and keeping things, the book straight. The invoices that came from Ramona to OTA never billed for both projects. The only invoice. Why is that significant? I don't understand. Because they never treated it as an open account. Well, the credit application for this particular location was an open book account. Your Honor, they never billed. And it contemplates that the rental material or the rental items would be, you know, maybe on the project site for an extended period of time. Some were. Some weren't. Not all the equipment stayed there the whole time. And that's where each invoice was tied to the rental agreements. And there was clear testimony the rental agreement number was the identical one to the invoice. And that's what Ramona admitted at trial, that they believed the rental agreements controlled the obligation. And there's no testimony otherwise. And if those rental agreements controlled the obligation, does it necessarily follow that each of those rental agreements constitutes a separate contract? Yes. Why? Because the rental agreements were either signed or verbally approved. And there was clear testimony throughout that they treated these rental agreements first with signatures, then they would get verbal approvals. And it was for the specific equipment, for the specific period of time. They changed the terms, whether there would be certain insurance for the property or not. And things constantly changed. Were the delivery charges changing? So the rental agreement was the one that had all the specifics, and it was specifically then approved by Otay Group. These weren't separately negotiated, were they? Well, they were to the extent that they set up the amount of the charge. Well, I understand. It's a formal matter. But what we have here in the real world is an arrangement with somebody to supply equipment. And when equipment is needed, a separate rental agreement is provided and somebody signs it and it's sent out. Why isn't that really the equivalent of an open account? It's similar to merchants. You know, they have a course of dealing. Here they had a course of dealing that they would rent equipment, they would specifically approve what was being rented for what period of time at what charge, with what additional charges, be it insurance or delivery charges. And it had to be specifically approved either in writing or verbal conversation. And it says verbal on the rental agreement. And when the rental agreement closed, and that was a big word for Ramona, then they issued the invoice immediately afterwards. Under your view of the Miller Act, how many invoices would Ramona have to send? How many claims? 90-day notices. How many 90-day notices? Well, it's 90 days. So when you look at the two sheets I gave you, you probably have to give about four, maybe three. So you can aggregate things every 90 days. Absolutely. Because it says for which such claim was made, you have to do it within 90 days of last supplying it under an invoice. So here if you have... It doesn't say under invoice, though. It says for which such claim is made. Understood. But the record was clear. Well, but let's go backwards for a second. You do agree that the statute of limitations is longer. The statute of limitations... I realize the statute reads differently. It's a one-year. So what is it that requires that the claim be made within 90 days of the last claim being made? It requires that the claim be made within 90 days of the time that something is produced, even if the other side has a year to pay for it. And that's where you get into statutory construction. Yes. Because when you have differing statutes and they have different words, if it was intended by Congress to have different meaning. And when you look at before the one-year statute, that's from the person. It's not for which such claim was made. So when the person last supplied materials, that's when your one-year begins to run. But I take it your case turns on the argument that the invoice is the claim. The rental agreement is the basis of the claim, and they issued the invoices based on that. So one of those two are the claim. Yes. I understand how an invoice can be a claim. How is a rental agreement a claim? It's a contract. I'm looking at one that appears to be, I'm not sure this is a typical rental agreement, but I'm looking at one in the excerpts of record. Yes. 911. 9, I believe it's 936 and 937. 936. And the rental terms are on the back. Well, let me see. Let me see. And it says terms and conditions. Yes. Okay. There's one on 911 as well. This is a typical, a typical this is what they use throughout the relationship. The rental agreement terms are all the same as what you have on page 937. And it was that. That was the terms and conditions of the contract, and it's a breach of contract for which this claim is made. You could have 80 different breaches of contract. And that's what makes it different here, because you don't have one contract. You have 80 contracts where there was nonpayment, as shown in those two sheets I gave you. So what was the purpose of the overall credit application, the underlying agreement, to open an account? Because I understand this probably was they called up and made a request or whatever for a particular item of equipment, right? It was a meeting. These people actually knew each other from some armed service. And it was a question about whether giving credit. And the interesting thing was they had no bank account. They had no jobs. They had nothing. And they were given credit. But at the same time, it's admitted by Ramona. They knew there was a bond, and they were never worried about getting payment. So, yes, it's a credit application. And that's where you have your rental invoices. And you can't read this one as well. But what it would say as far as. Tell me which one you're referring to. This would be page 936, but I apologize. Is it in the supplemental excerpts? These are the supplemental excerpts. It's excerpts of record volume 6 by the appellants. Okay. And, again, it's not clear. But they would say. See, it says deposit on the top right, and it says on account. So that way they didn't have to give a cash payment. It was on account. And, you know, it just does it on a cash basis. If I could, I'd like to go back to two things. And one is as far as mitigation. And this is very important. This is where the court just got it wrong. Candelaria. Oh, I'm going to run out of time. Go ahead. Candelaria had a very difficult termination process. It was a two-step process that's described in the briefs. Ramona could take back their equipment without notice. They never did it. And the court justifies it by saying, well, they knew that Candelaria was trying to work things out. Well, that is not what she said earlier in the court. Earlier on page 3 of the opinion, she says, Candelaria never gave notice. Almost like they failed to give notice to Ramona. But then at the end of the opinion, page 16, she says, Ramona had a good faith belief that OTI and Candelaria would resolve their issue and payment would be forthcoming from OTI. They had no way to know it. They had no way to know what was going on. They had no way to know whether Candelaria had talked to them. And the other thing is I went through the first — So your position is if this case ends up going back, that factual finding, does it remain or do you have a new trial? I'm sorry, I can't hear you. So let's assume you prevail on your Miller Act claim, your Miller Act interpretation. There still are some invoices subject to the Miller Act in this case. Yes. And then there would be a dispute about mitigation? There would be. And are you suggesting that the findings that the judge made would somehow carry over to that dispute? Well, there are findings, but it's clearly erroneous because she said she justifies the June 10th as being the last day to mitigate based on Ramona somehow knowing that Candelaria was trying to work things out with OTI in that one-month period where they're trying to terminate with a double written notice. And the clear point that the judge makes earlier in the opinion is Candelaria never spoke with Ramona about this. They had no knowledge. Then I went through every piece of testimony by OTI. OTI never said they knew that Candelaria was trying to work things out. It's a false justification. There is no reason that June 10th after termination, which was June 5th, that that would be the time they should have mitigated. What was the mitigation you expected them to do? Go in and take the equipment. I thought I read someplace in the record where there was like a two-week period where they couldn't get access. That was after termination. That was after June 5th because then it was a prison. They couldn't just go in there after termination. No one could get in. There was a termination by the sub, and then I can't give you all the details. But prior to that, they could have gotten their equipment. What we heard from Ramona was the clear voice of practice. So as soon as they didn't get paid, they should have gone in. Not immediately, but when you go through step-by-step, they demand $200,000 at the end of March. They don't get it. They demand meetings, and they even threaten them, do we have to file against the bond? They don't do it. They constantly have meetings. They constantly are giving AR. One more point. I want to get into service charges quickly. The only justification that the court has for service charges is the testimony of Charles Miller. Charles Miller was the only expert. There were no experts by Ramona. And I really urge you to read the quote on the excerpts of Record 9, page 131 through 132. Clearly, Charles Miller testified that if you don't use service charges, they're waived. And then I specifically asked, so can you waive service charges? He says yes. So both in the written opinion, as well as the order that denies motion to reconsider, she quotes the end of what he said and ignores the fact that if you don't use service charges, they're waived. You said every invoice had to contain. I'm sorry? Every bill had to contain the service charge in? No. Matter of fact, they never charged. That's what I mean. In order to claim, in order to get service charges or to recover service charges, they should have included the service charge in each of these invoices? The amazing thing is they issued two invoices for service charges during the project, and they were both reversed. They never issued invoices for service charges until June 30th, and that's when they were working up their Miller Act claim. So failure to assert a service charge, if it's not asserted timely, is waived. That's a fairly common commercial practice, and under most state laws that's what they do. Are you saying that that is sort of the law that applies in this case? I would think that would, but additionally the actions, they issued two service charges, written service charges, and they reversed them. We cite that in the record. So the act, intentional act, and that's waivered. The intentional act was we're not going to charge you until they worked up the service charges when they were working up their Miller Act claim. Okay. All right. Thank you. Good morning. James Crosby for Apelli Ramona Equipment Rental. I'd like to note for the record the appearance of my colleague, Leah Plaskin, who helped on the case. I'd like to start by addressing the Pippin case, which was the case that the court requested some further discussion on at the time of oral argument. And this goes to the 90-day defense, notice defense. And Pippin says, and it's dictum is Pippin, is it not?  Well, no. Well, no. I mean, it was. Because they're talking about the statute of limitations. They're talking about statute of limitations, but they did an analysis of the 90-day notice period to work up to the statute of limitations. It says the 90-day notice begins from the last day that the equipment is available or material is available for use on the project. That's the way I read it as well. Here's my difficulty with that and with your argument. So see if you can address it directly. If you read this as meaning you can supply equipment, let it sit there for a year, and then only wait, knowing that there's some difficulties in payment, and claim the rental charges for that entire period, it gives rise to the potential for bad behavior. So why should we read the statute that way? But that's not what happened here. Well, they say it is. But put that aside for a second. This is simply a matter of statutory interpretation. You're asking us to say that if somebody supplies something on day one, learns on day three that he's not going to get paid, and then just says, I'm leaving it there for your use, he can wait until a year, because that's the statute of limitations, and then file his 90-day notice. And that's not you. I'm not accusing you of anything. But doesn't that encourage a bad outcome? Well, I don't know. I mean, it depends upon the facts there. And I would note that the district court judge, Judge Huff, in this case indicated that no one applies to this case under the specific facts of this case. She's not argued a broad across-the-board application of Nolan. She just says under the facts of this particular case, Nolan is the proper law to apply. And what happened in this particular case is that, and Judge Huff made particular rulings, factual rulings on this, is that the equipment was on an open book account. Each of the subsequent rental agreements, most every one of them indicated it was continued or on account. It was for the same pieces of equipment that were on the site being used over the entire course of this set of circumstances. Is that true? Were they used? You only sent one notice, as I recall. Yes. We sent one 90-day notice. At the end of the statute. Near the end of the statute of limitations. The day after the contract. The day after we got notice that the contract was terminated as between the prime contractor and OTIME. So is it your position that all this equipment was actually being used all that time period? That's my position. And that was Judge Huff's ruling, factual ruling as well. If you look at the excerpts of record at page 23 through 25, she makes those rulings. She makes the factual rulings that it was a master account. It was an open book account. All the equipment was on site being used for the entire period of time. And that's one of the reasons why she felt that Nolan was applicable in this case because it was not a separate group of individual rentals and individual contracts. It was a bunch of equipment on site and that the rental agreements were just re-ups every month for the purposes of billing. What is your obligation under the Miller Act when you issue invoices that don't get paid? Our obligation is to comply with the 90-day rule, which is to provide notice within 90 days after the, in this case, the last of the equipment was on site and available to the prime contractor, to the contractor. Would there be no other duty to mitigate? There is a duty to mitigate, but the court in this case made factual rulings that we had acted in good faith and reasonably to mitigate our damages, specifically based upon the notion that we were getting paid by OTI on the other job. We were getting regular payments from OTI on the other job, and OTI was designating to us these lump sum payments that would come in. OTI was telling us how to divide those. Do reasonable and prudent businessmen usually allow the designation as to which accounts payments are to be applied to the exclusive elimination of payments to another project? Well, I'm not sure I could opine on what reasonable people do under particular circumstances, but in this case the course of practice between these particular parties was these lump sum payments would come in, and then we would get direction as to how to apply them to the particular jobs, and those payments continued on right up until the time of termination. In addition, How much was received in total? Hundreds of thousands of dollars. I don't know the number of that. How much was applied to this project? About $18,000. Is that prudent? Sure. We're being told by OTI how to apply the lump sum payments that came from that. And when you supply equipment to people, that's what you would always do. That makes sense? I don't know if that makes sense, but that's the course of conduct between these particular parties. We are taking the direction of the payor on a lump sum payment as to how to apply it. So you have no obligation at all to the bondholder who's at risk to pay the whole sum owed at the end of the day. You don't ever give them notice of any kind that there's a problem. You don't tell them anything, and you're moving all the money to payment on the New Mexico project. Well, we're not moving money anywhere. You're applying it to the New Mexico project to the complete exclusion of the El Centro project, right? Respectfully with the direction of the payor. That's what they were telling us to do. But you looked eventually to the bondholder. You didn't feel like you had any reason to give notice to the bondholder that they might be at risk? Well, we did give notice to the bondholder. We gave our 90-day notice to the bondholder at the time that it was appropriate to give that. After the project's entirely upside down? No, it wasn't entirely upside down. We were getting paid on the other job, and they were being applied. And it's a very short period of time. And the facts are, the factual determinations made by Judge Hupp is that Candelaria knew in early May that the job was upside down and the subcontractors were not being paid. In early May. They didn't terminate until almost a month later on June 5th. Now, their argument is that they had these double notice provisions. But the purpose of the bond notice is to protect the prime against double billing. In other words, they need to know so they don't pay more money to the contractor and then have to pay that same money to the supplier or my equipment supplier in this case. But during that period of time, in this case, there's no evidence that any such money was paid out. In fact, they only paid on this particular project, they only paid OTI Mesa $70,000 on the entire $600,000. So as applied to the facts of this case, this double billing problem, which the 90-day notice was designed to protect against, was not even a consideration. So as applied in this case, it doesn't make sense. I mean, the justification for writing an earlier notice or for pulling our equipment off site just doesn't make sense. With respect to the notion that we should have gone out and pulled our equipment off site in early May, the contract was still proceeding. The job was still proceeding. They were still using our equipment on site. They just weren't being paid. That's right. This was a payment issue between Candelaria and OTI. The job was proceeding. It wasn't terminated until June 5th. I suspect if we'd pulled our stuff off the project, we would have been in trouble for perceived early breach or early termination of the contract. But I'm still interested in the issue Judge Erickson asked you about, and I understand that the facts of this case may not match up perfectly, but we're doing statutory construction here. There is something a little bit troubling about knowing about the bond issuer, not knowing that he's on the hook for a lot of money and that he might be able to tell the general or the sub, let's stop here. Let's not keep running up these bills because I'm on the hook for them since all of you guys appear to be bankrupt or not able to pay the bills. If the 90-day notices are issued as your opponents claim, that does allow the bond issuer to step forward and stop this damage from accruing. And under your interpretation, it really doesn't, although you suggest in your case that wouldn't have been an issue. Why should we adopt, if that's so, if I'm thinking correctly about the world in general, why shouldn't we adopt a 90-day interpretation? The 90 days from every 90 days, if you will. Well, I can understand that, and I'll address that a little more broadly quick. But, I mean, all we can do is do what the statute tells us to do. And the statute tells us 90 days after we last furnished or supplied equipment to the job. Well, there's cases on both sides of that. Well, there's cases on both sides of that, but it's not a split by any stretch of the imagination. Most of the district courts of appeal who have looked at it have ruled consistently with the Nolan case. There are a couple of district court cases, one out of Wisconsin and one out of New York, that rule Dave Felipe's and the Country Boys case. Those are district court cases that ruled counter to Nolan. But Nolan is followed by the great weight of authority. And is Nolan the only court of appeals opinion on point? I'm sorry? Is Nolan the only court of appeals opinion on point? No. There's a fourth court of appeal decision. There's a fifth court of appeal decision. Yes. The fourth is Nolan. Yes. But there's a fifth court, and I think there's a seventh court. We cited those in our brief. I think it's page 18 and 19 of our brief. So your argument is that when you started out, your argument was that on the facts of this case, the claim that was being made was established by the district court was all of this, all of these invoices and everything together. That was the claim. That's right. And that's appropriate. It's grounded in the notion that there was an open book account. And the Court found that. The Court, Judge Huff, as a matter of fact, found that. And under a clearly erroneous statute, that has to be pretty wrong. So what's the significance of the terms and conditions that are attached to the backside of each of these rental agreements? Well, the testimony from Mr. Perry was there was testimony across. But the thrust of his testimony was that the credit application at the front end established an open book account. It says it in there, established an open book account. Yes, I saw that. And for the purposes of, and then we had, for example, ten pieces of equipment. We had, or let's just say one piece of equipment. We had a water truck on the site for the whole period of time. But every month, they would just do a new rental contract to re-up and bill it. And then on that rental contract, it says continued on account. And then they would use that for billing purposes to generate an invoice to get paid for that particular month. So it was more, and Mr. Perry testified to this, it was more of a billing process than it was an intention to create additional. So you had no right to claim attorney's fees under? No, we had a right to claim attorney's fees under both the credit application and under the rental agreements. It was, there was attorney's fees. But if the rental agreements were nothing more than just, you know, sort of a recognition that the equipment was on the left. Why would you have a right to claim attorney's fees? Well, there's, under these rental agreements. Well, they are agreements. I mean, I can't tell you. So these agreements modify the open book account? No, they are, they are, I mean, I'm not quite sure how you justify or how you characterize it. But the way it worked is they did these separate agreements every month for invoicing purposes. And each of those agreements were signed off on. But they, but they. Excuse me, could you have just taken these agreements and gone down to the superior court and filed an action for breach of contract? I suspect you could have. Based on these. I suspect you could have. Even absent the open credit account. Yeah, I think you probably could have. And conversely, I think that you, if you didn't have the rental agreements, you could have gone down and filed an action for an open book account, being on the credit application. But I think that the point that needs to be made is that this was all the same 10 pieces of equipment or 15 pieces of equipment. And they were on site over the entire period of time. And Judge Huff ruled that way. That's what she ruled as a matter of fact. So what we're doing is we're creating this artifice under their analysis is that you have a water truck on site for 30 days, or 90 days, or 120 days, being used all this time, being used and available up until the contract termination on June 5th. But because they had separate little agreements every month for billing purposes and invoicing purposes, and they were called rental agreements, therefore, that's a separate contract, a separate rental, and a separate claim based upon a separate contract for the same use of the same labor, material, and equipment being furnished or supplied under the statute. And that's just an artifice. It doesn't make sense. It's inconsistent with the statute. Of course, it's a box that your client put us in by issuing the invoices each time. Well, yeah, but... I mean, if they hadn't issued the... I mean, it's not like someone else issued the invoices. You did. Well, yeah, but he had to issue invoices to get paid. I mean, even on an open book account, you're doing some kind of documentation to be paid. I mean, you have an open book account. You've got to send invoices out and you're being paid. So I don't think that fact with respect in particular matters much. Well, the reason I ask is these invoices seem to be something more than invoices. They seem to be new rental agreements, if you will. That's how they're phrased. Well, I think in practicality they were for billing purposes. I would agree with you, Your Honor. I would agree that they're probably separate stand-alone contracts if you wanted to view them that way. But the problem is, is that what counsel reads into the statute is that each claim under the 90-day statute is a contractual claim. It's a claim based upon a contract. And there are courts that have recognized that, right? And I understand that you want to say Noland is controlling and that that's authority and that pay no attention to these district courts. They're wrongly decided. But doesn't it appear that there's an emerging trend because these district court cases that have come along that said on an open account that they shouldn't be treated as a single contract, all those cases have arisen after 1990 and they move forward into the 2010s? And isn't that an emerging trend? I mean, I understand that they're not controlling the precedent, but you're asking us to rely on a 19, what is it, 1959 case and a number of cases from the 1960s and pay no attention to these cases that have arisen after 1990? Why should we do that? Well, I don't, I don't, well, number one, with respect, I'm not sure that two district court cases from across the country are an emerging trend because no court of appeal has ruled that way ever, frankly. There's been no court of appeal decision that's ruled consistent with De Felipe's and Country Boy's. And the reality is that those two opinions are just decided wrong if you look at the remedial and liberal interpretation that the 90-day statute in the Miller Act is to be given. And if you just look at those cases, whether you call them an emerging trend or not, which I just don't think the record reflects, they're just not decided right and consistent with the statutory purpose of the Miller Act. The Miller Act is designed to protect people like my client. Absolutely. And the reality here is if you look at the numbers that are in the record, if my client is not compensated for the equipment that it rented on this job and which was used on this job up until termination on June 5, Candelaria gets a huge windfall. I mean, they didn't pay the contractor. They paid $70,000 on a $600,000 contract to the contractor, and now they don't want to pay us. They get a huge windfall. And if you look at the remedial purpose of the statute, I don't see how that can be an appropriate end result of all this. I realize we're over your time, but I want to ask you one last question. Did you waive your right to recover finance charges, service charges? No. I still don't really understand that argument. Number one, it wasn't raised in the district court. It wasn't even addressed in the memorandum of decision because it wasn't an issue before the trial court. It was only first raised in a post-judgment motion to amend or alter, so I'm not even sure it's properly before the court. They'd have to appeal that particular ruling, and it would be under a different standard. But I'm not even quite sure what the waiver argument is. Their own expert, Miller, said that it happens all the time, that you can use service charges to get payment, and you can waive service charges to get payment. And each of the rental agreements and the credit application have anti-waiver provisions in them. They all say that if we don't enforce a particular term of the contract, it doesn't mean we're waiving our right to enforce that particular term of the contract. My clients are in a business. They're in a commercial endeavor. They have a right to work with their clients and waive service charges or enforce service charges without having the penalty of four or five years after the fact, somebody coming in and saying, well, you gave us a service charge back here on, you know, October 10th, so therefore you waived your right to get all your service charges on October 11th. That's what the anti-waiver provisions in the rental agreement and the credit application are designed to protect against. And Judge Huff looked at this in the motion to amend and alter the judgment, and she made specific factual rulings that there was no waiver. And those are factual determinations. So I think what I think is going on, other than the broad kind of legal issue about application of Nolan, which I think is a little narrower because Judge Huff applied Nolan under the facts of this particular case, and I think she's correct. But other than that, the rest of this is just a big argument about facts, and it's an effort for them to supplant their version of what they think the facts are for Judge Huff's version of what she thinks the facts are. Okay. Thank you. Thank you. Yeah, two minutes. You've got two minutes. We'll put two minutes on the clock. Thank you very much, Your Honor. Judge Huff decided that Blue Circle and Bowdoin, the ones that say that the 90-day notice is a conditioned precedent to a cause of action, was not applicable to this case because Candelaria only paid $70,000 of the $600,000 contract. Well, that contract was breached, they were terminated, and to say that Candelaria got a windfall is false because there was testimony that Candelaria lost a million dollars on that subcontract and having to finish their job. But you can't waive a conditioned precedent of providing 90-day notice, and that's specifically what she says in her opinion. What do you do with Pippin? I'm sorry? What do you do with the Pippin case? You know, the Pippin talks about 90-day, when it starts to run based on the one-year statute, and it's so – But it says there if those should be interpreted the same way. Right. But that case does not look at the words for which such claims should be made and does not look at a case where you have multiple contracts for which the claim was made. It's just not present in that case. It's not discussed in that case. But we do have a whole series of cases, Pippin cites some of them, that seem to say the same thing over and over again. It's the last day the materials were used, or it's the day that the subcontractor was terminated. Are they all just dicta? Well, it doesn't follow the Supreme Court, and that is statutory construction. If there are different words in different parts of the statute, there's meaning that was intended by Congress, and here Congress intended for which such claim to be made based on the underlying contract. One more point, though, on service charges. There was no factual findings. The only thing she based service charges on was the testimony of Charles Miller, and she forgot it. She said, you know, what it said and just missed the quote, and we've quoted the entire thing. He testified clearly that if you waive them, if you don't use them, you waive them. You're over your time. Thank you very much. I appreciate it. The matter will be submitted at this time. Thank you, counsel, very much for your audience. Very interesting case. Thank you.
judges: Erickson, Paez, Hurwitz